LAW OFFICES OF SIMON HARTER, ESQ.
Simon Harter (SH-8540)
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 – Phone
(212) 979-0251 – Fax
Attorneys for Plaintiff, Ardemar Marine Limited



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

ARDEMAR MARINE LIMITED,

                   Plaintiff,

  -against-

SCOTLINE INC.,

                 Defendant.

07 CIV 6186

**<u>VERIFIED COMPLAINT</u>**

------------------------------------------------------------x

       Plaintiff, ARDEMAR MARINE LIMITED, by its attorneys, Law Offices of Simon Harter, Esq., as and for its Verified Complaint against the named Defendant, SCOTLINE INC., alleges upon information and belief as follows:

       1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, in that it involves claims for breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Finally, this Court also has jurisdiction over this matter because the action also arises under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et seq.*

2.  At all times relevant hereto, Plaintiff was and still is a foreign business entity organized and existing under the laws of Cyprus with a registered office at 24a Archimedous Street, Engomi, Nicosia 2411, Cyprus.

3.  At all times relevant hereto, Defendant was and still is a foreign business entity organized and existing under the laws of Canada with a registered office at 1560, 521-3rd Ave. SW, Calgary Alberta T2P-3TC, Canada.

## AS AND FOR A FIRST CAUSE OF ACTION – CONFIRMATION OF PARTIAL FINAL AWARD

4.  On or about 5th December, 2005, Plaintiff, in the capacity as owner, entered into a maritime contract of charter party, written on an amended GENCON form, with Defendant, pursuant to which Plaintiff agreed to let and Defendant agreed to charter the Motor Vessel SHAKHTAR for a voyage charter trip from North China to ports in the Mediterranean/Mauritania range.

5.  The charter party provided, *inter alia*, that should any disputes arise between the parties, they were to be referred to arbitration in London, England.

6.  During the performance of the charter party, Plaintiff claimed € 105,321and US $11,963.78 for discharging costs and US $226,914.46 for demurrage, along with interests and costs. Defendant denied liability for these amounts.

7.  These disputes were submitted to arbitration in accordance with the aforementioned clause.

8.  On the 20th April, 2007, a partial final award was issued by the chosen arbitrators, Mr. Mark Hamsher and Mr. Richard Faint, a copy of which is attached hereto as *Exhibit "A"*, and which is certified by the undersigned to be true and correct (hereinafter "Partial Award").

9.  In the Partial Award, Arbitrators Hamsher and Faint awarded Plaintiff the following sums - as set out in Exhibit "A" at pp. 3-4, ¶ 6 A) through F) - which amounts are now due and owing to Plaintiff and which have not been paid by Defendant.  (As of the date of this Verified Complaint, the rate of exchange is €1 = $1.3627 and £1 = $2.0170).

| | | |
|---|---|---|
| A. | Balance of Plaintiff's principal claim | $382,399.17 |
| B. | Interest on the balance of Plaintiff's principal claim at a rate of 7.5% per annum compounded at three monthly rests (i.e., quarterly) from 6th May 2006 until the date of payment (which is calculated, solely for the purpose of this proceeding, through the date of this Verified Complaint) | $ 34,021.75 |
| C. | Plaintiff's legal costs in so far as they relate to the Partial Award (which Plaintiff has claimed from Defendant but which Defendant has not accepted or paid to date) | $ 35,000.00 |
| D. | The arbitrators' fee of £6,400.00 for rendering the Partial Award, which has been paid in full by Plaintiff but not reimbursed by Defendant despite due demand | $ 12,908.80 |
| E. | Interest on legal costs and arbitrators' fees at a rate of 7.5% per annum compounded at three monthly rests (i.e., quarterly) from 20th April 2007 until the date of payment (which is calculated, solely for the purpose of this proceeding, through the date of this Verified Complaint) | $ 739.49 |

10. Arbitrators Hamsher and Faint specifically reserved the right of the arbitrators to make further award to Plaintiff in respect of their claim for indemnity should Plaintiff be liable for any amounts due relating to Defendant's breach of the charter party in failing to discharge the cargo.  See, *Exhibit "A"* - Partial Award at p. 4 ¶ 6. F).

11. No security for Plaintiff's claims has been posted by Defendant or anyone acting on its behalf.

12. Defendant has not appealed from, or otherwise moved to set aside, the Partial Award of the aforementioned sums to Plaintiff, which award is final, and Defendant's time for doing so has passed.

13. Pursuant to 9 U.S.C. § 207, Plaintiff is entitled to have this Court confirm, recognize and enforce the Partial Award as a judgment of the Court in the amount of US $465,069.21 or alternatively, in an amount determined by the Court to be proper on the basis of the appended Partial Award.

## AS AND FOR A SECOND CAUSE OF ACTION:
### RULE B ATTACHMENT

14. Plaintiff repeats and reavers each of the allegations in Paragraphs 1 through 20 as it fully set forth herein.

15. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, but Plaintiff avers, on information and belief, that Defendant has, or will have during the pendency of this action, assets within this District comprising, *inter alia*, cash, funds, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, or any other tangible or intangible property, of, belonging to, due, claimed by or being held by or for the benefit of Defendant (hereinafter "assets"), located at, moving through, or held by, any garnishee(s) located within this District, including but not limited to HSBC (USA) Bank; Bank of America; The Bank of New York; Citibank N.A.;

JPMorganChase Bank; Standard Chartered Bank; Wachovia Bank N.A.; Deutsche Bank AG, and/or others.

16. Plaintiff, for its part, has satisfied all of its obligations under the terms of the charter party.

WHEREFORE, Plaintiff, ARDEMAR MARINE LIMITED, prays:

a.  That process in due form of law according to the practice of this Court may issue against Defendant, SCOTLINE INC., citing it to appear and answer the foregoing, and failing such appearance and answer, to have judgment by default against the Defendant in the principal amount of the claim, plus interest, costs and reasonable attorneys' fees;

b.  That if Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of $465,069.21 may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due, or for the benefit of, Defendant, including but not limited to such assets as may be held, received or transferred in their own name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody  or control of banking institutions including but not limited to HSBC (USA) Bank, Bank of America, The Bank of New York, Citibank N.A., JPMorganChase Bank, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank AG, and/or any other garnishees(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served;

c.  That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary in order to give effect to the London arbitration; and

d.  For such other, further and different relief as this Court may deem just and proper in the circumstances.

Dated:   July 2, 2007

- 5 -

**LAW OFFICES OF SIMON HARTER, ESQ.**
Attorneys for Plaintiff,
ARDEMAR MARINE LIMITED

By:    _____
Simon Harter (SH-8540)
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 (Phone)
(212) 979-0251 (Fax)

## ATTORNEY VERIFICATION

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK      )

SIMON HARTER verifies the following pursuant to 28 U.S.C. §1746:

1.      I am a member of the Law Offices of Simon Harter, Esq., Attorneys for Plaintiff, ARDEMAR MARINE LIMITED, in this action and a Member of the Bar of this Honorable Court. I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information, and documentation provided by the Plaintiff and/or its duly authorized agents.

3.      The reason this Verification is made by an attorney and not the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

I declare under penalty of perjury that the foregoing is true and correct.

New York, New York
Executed on the 2nd day of July, 2007.


Simon Harter (SH-8540)
Law Offices of Simon Harter, Esq.
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 - Phone
(212) 979-0251 - Fax

# EXHIBIT "A"



<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN ARBITRATION</u>


B E T W E E N :-


### ARDEMAR MARINE LIMITED

<u>Claimants</u>
(Owners)


-    and –


### SCOTLINE INC., Alberta, Canada

<u>Respondents</u>
(Charterers)


### "SHAKHTAR"

<u>Charterparty dated 5th December 2005</u>


---

### PARTIAL ARBITRATION AWARD

---


W H E R E A S:-

1.    By a contract in and evidenced by a recapitulation email of 5th December 2005, the Claimants (hereinafter referred to as "the Owners") agreed to carry up to a full and complete cargo for the Respondents (hereinafter referred to as "the Charterers") from 2/3 ports in China to 2/3 ports in the Mediterranean/Mauritanian range.

- 2 -

2.  The said charterparty provided, inter alia, that should any disputes arise between the parties, they were to be referred to arbitration in London, each party appointing an arbitrator with the two arbitrators having the power to appoint an umpire if they were unable to agree.

3.  Disputes arose between the parties as detailed hereafter. The Owners appointed me, Mark Hamsher of 18c Ensign Street, London E1 8JD, as the arbitrator nominated by them. The Charterers appointed me, Richard Faint of 21A High Street, Lyndhurst, Hampshire SO43 7BB, as the arbitrator nominated by them. The seat of the arbitration is in London.

4.  The Owners claimed damages of €105,321 and US$11,963.78 in respect of discharging costs and demurrage of US$226,914.46 together with interest and costs. The Charterers denied liability for the claims.

5.  We received written submissions from the Owners' London solicitors and from the Charterers' Piraeus lawyers. The parties were content that we should proceed to our award on the basis of the written submissions alone without an oral attended hearing. The Owners requested us to make a reasoned award and our reasons are hereby attached to and form part of this our final award.

6.  NOW WE the said Mark Hamsher and Richard Faint, having taken upon ourselves the burden of this reference, having considered the written evidence and

- 3 -

arguments submitted to us, having conferred and agreed with each other and in so doing having no need to appoint an umpire, DO HEREBY MAKE, ISSUE AND PUBLISH this our PARTIAL AWARD as follows:-

A)     WE FIND that the Owners' claims for €105,321, US$11,963.78 and US$226,914.46 succeed in full.

B)     WE THEREFORE AWARD AND ADJUDGE that the Charterers shall forthwith pay to the Owners €105,321 (one hundred and five thousand, three hundred and twenty-one euros) and US$238,878.24 (two hundred and thirty eight thousand, eight hundred and seventy-eight dollars and twenty-four cents) together with compound interest thereon at the rate of 7.5% per annum compounded at three monthly rests from 6th May 2006 until the date of payment.

C)     WE FURTHER AWARD AND ADJUDGE that the Charterers shall bear their own and the Owners' costs of the reference, the latter, if not agreed, to be assessed in the option of the Owners either by the English High Court or by us in an award of costs (we hereby reserving our jurisdiction as necessary).

D)     WE FURTHER AWARD AND ADJUDGE that the Charterers shall bear the costs of this our award in the amount of £6,400.00 PROVIDED that if, in the first instance, the Owners shall have borne any part of the said costs

- 4 -

of this our award, they shall be entitled to immediate reimbursement by the Charterers of the sum so paid.

E)    WE FURTHER AWARD AND ADJUDGE that the Owners shall be entitled to compound interest at the rate of 7.5% per annum compounded at three monthly rests on any sums payable them under paragraphs C and D above from the date of this award until the date of payment or reimbursement as appropriate.

F)    WE DECLARE that this award is FINAL as to the matters herein determined, but we reserve to ourselves the right to make a further award or awards as may be appropriate in respect of the Owners' claim for an indemnity for any damages that they are required to pay to the receivers/bill of lading holders/cargo interests arising out of the Charterers' breaches of contract in failing to discharge the cargo and/or failing to pay for the discharge of the cargo.

GIVEN under our hands in London this    20ᵗʰ    day of    April    2007

Mark Hamsher                                          Witness

- 5 -

..........................................

Richard Faint

..........................................

Witness

**"SHAKHTAR"**

Charterparty dated 5th December 2005

REASONS FOR AND FORMING PART OF THE

PARTIAL ARBITRATION AWARD

1. This arbitration concerned a claim by the Owners to recover demurrage and discharging costs which, it was their case, they had been obliged to incur because of the failure of the Voyage Charterers to arrange and pay for discharge.

2. The "SHAKHTAR" is a 1984 built flush tweendecker flying the Ukrainian flag. She has a deadweight of 14,930 metric tons on a summer draft of 9.8 metres. She has 5 holds and 9 hatches. She is equipped with 6 cranes with a safe working load of 12 tons and 1 derrick with a safe working load of 63 tons.

3. The "SHAKHTAR" was fixed by her claimant registered Owners to carry a cargo from 2/3 ports in North China to 2/3 ports in the Mediterranean/Mauritania range.

4. The respondent Charterers, Scotline Inc., then sub-chartered the vessel to Beijing Qingchuan International Freight Company Limited who in turn chartered the vessel to sub-sub-charterers, Sinotrans Limited of China.

- 2 -

Sinotrans had in turn concluded contracts with C.B.M.I. Construction Co. Limited who were both the shippers and the receivers.

5.    As is frequently the case, the contract between the parties was recorded in a fixture recapitulation email which incorporated the Gencon form charterparty with certain amendments.

6.    The Charterers drew up a formal charterparty but the Owners declined to sign it on the grounds that it did not accurately reflect the agreed contractual provisions. However, the recapitulation email was accepted by both parties as being an accurate record of what had been agreed. In the event, it turned out that there was no dispute about the accuracy of the contractual provisions that were relevant to the issues that we had to determine.

7.    The vessel loaded her cargo at Jingtang port for discharge in Malaga in Spain, Casablanca in Morocco and Nouadhibou in Mauritania. The vessel was at Malaga between 17th February and 21st March 2006. She was at Casablanca from 22nd March to 29th March. She was at Nouadhibou from 1st to 6th April. The Owners calculated that demurrage of US$226,914.46 had accrued. In addition, in order to ensure the discharge of the cargo, the Owners had concluded an arrangement with Sinotrans, in this respect acting on behalf of the receivers, under which they would both contribute 50% of the discharging costs. It was the Owners' case that the discharging costs should have been borne by the Charterers and therefore they claimed

- 3 -

the discharging costs of €105,321 and US$11,963.78 that had been borne by them.

8.    The fixture recap provided:-

"UPTO F+C CARGO BULK HLESS GNRLS A/O
STEELS A/O STEEL PIPES A/O
CHEMICALS OWS UNDER AND ON DECK.

…

FREE D/A BOTH ENDS
LOAD PORT DUES, AGENTS TO CONFIRM TO THE
OWNERS PAYMENT PRIOR VSLS ARRIVAL
DISC PORT DUES.  AGENTS TO CONFIRM TO THE
OWNERS PAYMENT PRIOR VSLS ARRIVAL

…

AT LOADPORTS MASTER TO SIGN ONLY NORMAL
MATES RECEIPT. OWNER'S AUTHORIZED BY
OWS/MASTER TO ISSUE
AND SIGN ON MASTER'S BEHALF BSL, ACCORDING
TO MATES RECEIPT SIGNED AT LDPORT, IN
STRICTLY CONFORMITY WITH MATE RECEIPTS
SIGNED AT LOAD PORT, CONCERNING
BDLS/WEIGHT LOADED.  CONGEN BSL TO BE USED
MARKED 'FRT PAYABLE AS PER C/P.  IF "FRT
PPAID" BILLS OF LADING TO BE REQUIRED – SAME

- 4 -

TO BE RELEASED UPON GETTING CFMN FROM
OWNER'S BANKERS THAT ALL FRT, LESS COMM,
ARRIVED TO OWNER'S BANK ACCT.

IN CASE C.O.B BS/L REQUIRED MASTER HS THE
RIGHT TO REJECT CGO WHICH NOT RESPONDING
'CLEAN' AND CHRTS/SHIPPERS TO REPLACE THE
SOUND ONE FOR THEIR TIME/ACCNT.

7 WWDAYS OF 24 CONSEC HRS, SSHEX FRI
5PM/8AM MONDAY EIU

7 WWDAYS OF 24 CONSEC HRS, SSHEX FRI
5PM/8AM MONDAY EIU

COMMENCEMENT OF LAYTIME SA [AS] PER
GENCON CP AMENDED INTO 2PM/8AM

…

DEMM USD 7850 PDPR / FD BEBS

…

CHTR'S NOMINATED AGENTS AT ALL PORTS, BUT
ALL DISBURSEMENTS TO BE PAID BY CHRTS
(CHTR'S TO PROVIDE TO OWNER'S THE WRITTEN
CONFIRMATION FROM EACH AGENT THAT D/A TO
BE PAID BY ('ASSOS SHIPPING).

…

C/P DETAILS

…

CL.23

- 5 -

> MASTER IS TO SIGN CONGEN BILLS OF LADING
> FOR THE NUMBER AND OR PIECES AND/OR UNITS
> AND/OR WHATEVER CASE MAY BE LOADED,
> WHICH ARE TO BE IN STRICT CONFORMITY WITH
> SIGNED MATE'S RECEIPTS AND IS TO REMAIN
> RESPONSIBLE FOR THE NUMBER OF SAME.
>
> CHRTS HAVE THE OPTION TO BASE THE BILLS OF
> LADING WEIGHT OR WEIGHT CERTIFICATES AND
> TO HAVE THE OPTION TO HAVE THEM CLEAN
> USED "CLEAN ON BOARD".
>
> …
>
> ALL OTHER TERMS TO BE LOGICALLY AMENDED
> AS PER MAIN TERMS AGREED"

The parties agreed a number of amendments to the printed Gencon form as well as some additional clause.

Printed clause 2 of the Gencon form provided:-

> "Owners are to be responsible for … delay in delivery of the
> goods only in case the … delay has been caused … by the
> personal act or default of the Owners or their Manager …"

Additional clause 20 provided:-

- 6 -

"A)   Cargo to be loaded, discharged, lashed, dunnaged
where necessary and discharged free of expense to the vessel
… "


Additional clause 23 repeated clause 23 as recorded in the fixture
recapitulation email.


Additional clause 31 provided:-


"Vessel free from any kind of taxes/dues, wharfages on
cargo.   Any taxes and/or dues and/or charges on cargo
and/or freight to be for Charterers' account.   Any taxes
and/or dues and/or charges on vessel to be for Owners'
account.   Vessel is to pay customary Harbour dues at both
ends. …"


Additional clause 50 provided:-


"Charterers to have the option to sublet the vessel or part
thereof, but Charterers to remain ultimately responsible for
the fulfilment of this Charter Party."


Additional clause 52 provided:-

- 7 -

"Master to co-operate with Charterers' representative at load and discharge ports in respect of loading, stowing and discharging of the cargo."

The agreed freight rate up to Nouadhibou Mauritania was for a lump sum of US$828,000.

9.    The freight provision in the sub-charterparty with Beijing Qingchuan International Freight Company Limited (a copy of which was adduced in evidence) was "freight rate – USD95 per CBM for Nouadhibou, USD65 per CBM for Casablanca, USD65 per CBM for Malaga".

10.    The Charterers argued that the Owners had been in breach of the charterparty in allowing project cargoes to be loaded. Furthermore, they alleged that the master had been negligent in failing to record the correct cubic size of the cargoes shipped under different bills of lading. The bills of lading recorded only the number of packages and the gross weights of the cargoes in question.

11.    The bills of lading described some of the cargo as "raw mill parts and accessories and kiln system parts and accessories", "mechanical equipment for a clinker grinding plant", "construction tools and living materials under contract …". The photographs attached to a report prepared by Captain George Dimas for the Charterers at Malaga showed some of the cargoes. His report recorded 9 tubes carried on deck with a diameter of 4.2 metres

- 8 -

each weighing between 45 and 51 tons together with other "long and heavy and volumed structural materials and high size of palletised cargo".

12. The term "project cargo" is not a term of art. It is generally used to describe one off shipments of cargo (often industrial plant or machinery) that is either unusually bulky or unusually heavy. The cargo that was carried on the "SHAKHTAR" could not be described as routine cargo. It seemed to us that most people would consider that it would properly be described as "project cargo" and would therefore not come within the categories of "harmless generals and/or steel and/or steel pipes" as provided for in the fixture recapitulation email.

13. It followed that the Owners would have been justified in rejecting the cargo that was tendered for loading under the charterparty contract. However, it did not follow from that that the Charterers were somehow able to claim damages based on an alleged failure by the master to reject the cargo. Although the cargo would almost certainly have been tendered for loading and subsequently loaded by the shippers, in doing so they would have been acting as the agents of the Charterers. The proposition that the Charterers could bring a claim against the Owners for a failure by the master to reject a cargo tendered on the Charterers' behalf merely has to be stated to be shown to be quite untenable.

14. The China Ocean Shipping Tally Company had produced a tally certificate showing that the total quantity of breakbulk cargo was 14,994.26 cubic

- 9 -

metres. They also recorded that there were 1,005.82 cubic metres of "over-longthed cargo" and 2,293.338 cubic metres of "over-weighted cargo". It was not clear whether the calculations for "over-longthed" and "over-weighted" cargoes were included in the total for breakbulk cargo or not. The sub-charterers apparently remitted a total freight of US$911,979.33 which would suggest that they based the freight entitlement on the total quantity of breakbulk cargo. The Charterers, however, argued that the correct figure should have been 19,062 cubic metres. They relied on an undated stowage plan apparently prepared by their representative at the load port, Captain Yi, on which he had crossed out certain typed figures and had inserted a handwritten total of 19,062.

15.    At the first discharge port of Malaga, Captain George Dimas calculated that the total deck cargo was 1,647.00 cubic metres, but he apparently made no calculations as to the volume of the cargo under deck; no such calculations are recorded in his report. He noted that the volume recorded on documents for individual packages appeared to be based on the volume of the equipment in question without taking account of the dunnaging around it.

16.    In any event, in the submissions served on behalf of the Charterers, they claimed additional freight from the sub-charterers of US$264,436.90 calculated, it would appear, by the difference between Captain Yi's figure of 19,062.52 cubic metres and 14,994.26 cubic metres on which the sub-charterers had presumably calculated their freight remittances. They

- 10 -

accepted that they had held the vessel at the Malaga anchorage between 17th and 27th February 2006 in an attempt to obtain payment of their claim for additional freight. It was their case that their inability to obtain payment of the additional freight was all due to the master's failure to issue correct bills of lading.

17.     There was no express obligation in the charterparty requiring the master to insert the volume of the cargo in the bills of lading. Indeed, the only relevant obligation recorded in the recapitulation email was to record bundles and/or weights. (The precise extent of the master's obligation in signing bills of lading was not unambiguous. The fixture recap said that the bills of lading had to be in conformity with the mate's receipt "concerning bdls/weight loaded" and, in another place, "for the number and/or pieces and/or units and/or whatever case may be loaded". On the other hand, it could be said that the obligation to sign bills of lading in strict conformity with the mate's receipts would extend to including any volumetric information included in the mate's receipts. It was not, however, a point that we had to decide. At the request of the Charterers' Piraeus lawyers, copies of the mate's receipts were attached to the reply submissions served on behalf of the Owners. Although there was a space for dimensions to be inserted in the mate's receipts, as far as we could distinguish from the copies that were adduced in evidence, the dimensions were never inserted and most certainly there were never any volumetric calculations in the mate's receipts. Furthermore, it was not argued on behalf of the Charterers that there had in fact been a causative failure by

the master to ensure that the bills of lading complied with the mate's receipts).

18.   In any event, the Charterers' argument that a failure to insert the volume of the cargo in the bills of lading was "contrary to the shipping practice in relation to the industrial plant huge machinery/equipment units" was in fact without foundation.   The charterparty between the Owners and the Charterers provided for a lump sum freight.   There was no reason at all for the master to guess that the Charterers might have needed cargo volumes for their sub-charterparty purposes.   The fact that the cargo holds were apparently full so that the calculation should have been a relatively straightforward one primarily requiring measurement of the deck cargo was neither here nor there.   There was no express contractual requirement for the master to carry out such a calculation and none could be implied on the grounds of business necessity.   There was no breach of additional clause 52 or any other provision of the charterparty.

19.   Although it was asserted that Captain Yi advised the master of his calculations, there was no written evidence of any requests having been made to the master to establish and record volumetric figures in the bills of lading.

20.   It also has to be said that there was absolutely no evidence to support the accuracy of the figure of 19,062 cubic metres relied upon by the Charterers.   As already explained, that figure was simply recorded in an

- 12 -

amended total by someone on a stowage plan. It might well have been the result of calculations carried out by Captain Yi but there was no evidence that that was the case and, above all, the workings to support the amended total were not disclosed. In other words, the totality of the evidence adduced by the Charterers in the arbitration proceedings did not actually establish that the figures contained in the certificate of the China Ocean Shipping Tally Company were inaccurate. Furthermore, as we have already commented, the Charterers did not establish that the figures for "over-longthed cargo" and over-weighted cargo" had to be added to the total for breakbulk cargo and were not already included in it.

21. As was validly commented in the submissions served on behalf of the Owners, it was unfortunate for the Charterers that they had not contracted on back to back terms. Their charterparty with the Owners provided for lump sum freight and their sub-charterparty provided for a freight based on volume. It was the Charterers' misfortune that the two different bases produced results that were unfavourable to them. However, they could not seek to lay the blame for those differences on the master and the Owners.

22. It seems that many of the delays in Malaga (including, by the Charterers' own admission, the period between 17th and 27th February 2006) were caused by the Charterers' attempts to collect additional sub-freights based on what they alleged were the correct volumes of the cargo. Whether they were justified in doing so under the terms of their sub-charterparty was

neither here nor there. As between the Owners and the Charterers, it was quite clear that the Charterers were liable for the delays caused by their attempts to collect additional sub-freights because by no stretch of the imagination could the absence of volumes in the bills of lading or the delays be blamed on the Owners.

23.    Although this was denied in the submissions served on behalf of the Charterers, it is also clear from the contemporaneous documentation that the Charterers were in no hurry to arrange and pay for the discharge of the cargo. The sub-charterers argued that the Charterers were responsible for discharging the cargo because the sub-charters had been concluded on liner out terms. The position of the sub-charterers appeared to be correct but, as part of their dispute about additional freight, the Charterers complained that the sub-charterers' description of the cargo had been inaccurate. The merits of the rival positions of the Charterers and the sub-charterers were in fact immaterial to the proper analysis of relations between the Owners and the Charterers. Under the terms of the head charterparty contract, it was quite clear that the Charterers were responsible for arranging and paying for discharge of the cargo. That meant that any delays in that process would give rise to an entitlement to demurrage on the part of the Owners once laytime had been used up unless the delays that occurred were attributable to the Owners. For the reasons already set out, none of the delays due to disputes about the correct freight payable under the sub-charterparty or due to debates about who was liable for discharging costs could be said to be attributable to the Owners.

- 14 -

24.  The Charterers argued that they did not know the reason why discharge had been suspended between 4th and 8th March 2006. It was not, they alleged, due to them and therefore demurrage should not accrue during that period. The Owners' response was that during the period in question, the stevedores had not been paid and since, under the terms of the head charterparty, that was the responsibility of the Charterers, demurrage would continue to accrue without interruption. That argument was not effectively challenged in the subsequent submissions served on behalf of the Charterers.

25.  There was no evidence to support the Charterers' argument that the Owners sought to undermine relations between the Charterers and the sub-charterers. Indeed, they would have had no incentive to do so; their only concern was to have the contract performed.

26.  On 27th February 2006 the Owners received a fax from Messrs. Richards Butler in Hong Kong, acting on behalf of Sinotrans, threatening that, unless the vessel immediately discharged her cargo, their clients would take all necessary steps to protect their rights including but not limited to arresting the vessel.

27.  On 7th March 2007 the Owners received a translation of an email from AMYA Abogados of Madrid, acting on behalf of the receivers, threatening also to arrest the vessel unless instructions for discharge were given before

1630 hours on that day. Given that the Charterers were showing no sign of discharging the vessel despite their obligations under the charterparty contract, the Owners and Sinotrans who, in this respect, were effectively acting on behalf of the receivers, came to an arrangement under which each of them would pay 50% of the discharging costs at the three discharge ports to enable discharge to take place. The sums contributed by the Owners are summarised in paragraph 7 above.

28.    In the submissions served on behalf of the Charterers, it was said that the letter from AMYA Abogados was "fully rejected by the Charterers as dubious and misconceived and legally with significance". They argued that if the Spanish and Hong Kong lawyers had known of the real facts about the "misdescription of cargo and actual cubic capacity of the cargo … they would not have opined as they did".

29.    Those comments were wide of the mark. Even if, for the sake of argument, the Owners were somehow to blame for the fact that the Charterers had not collected the full freight to which they considered that they were entitled under the sub-charterparty based on the volumes of the cargo, it would have not altered the position of Sinotrans or the receivers one jot – they were merely interested in ensuring the prompt discharge of the cargo that was being held on the vessel.

30.    On behalf of the Owners it was validly pointed out that if they had not come to the reasonable arrangement with Sinotrans, then the claims under

- 16 -

the charterparty would merely have escalated.    It was a sensible and pragmatic arrangement.    Bearing in mind that it was the Charterers' responsibility to discharge the cargo, the Owners were entitled to recover the costs contributed by them towards that exercise.

31.    The Charterers argued that the Owners had not shown that they had made the payments in question.    However, proper substantiating evidence was subsequently adduced.    Furthermore, the payments in question could not be categorised as "customary harbour dues payable by the vessel".    They related to the discharge of the vessel.

32.    We were therefore prepared to allow the recovery of the discharging costs in full.

33.    The Owners' demurrage claim was properly calculated and substantiated by supporting documentation.    The only defence raised by the Charterers related to a delay of 3 days when the vessel sailed to Xingang.    The Charterers alleged that the master was negligent in not advising them that all the space on the vessel was fully occupied by the cargo loaded at Jingtang and the vessel could not take more cargo at Xingang.

34.    However, that allegation overlooked the question of who was responsible for loading and stowing the cargo.    It was the Charterers who loaded the cargo.    Indeed, it was the Charterers' case that Captain Yi (who had allegedly recalculated the volume of the cargo) was their representative at

- 17 -

Jingtang. It was up to them to decide whether or not they could load further cargo. They had all the necessary information and there was no evidence to suggest that the master had in any way misled them as to what further cargo could or could not be loaded.

35. The Owners' claims for demurrage therefore succeeded in full.

36. Finally, the Owners sought an indemnity for any damages that they were required to pay to the receivers/bill of lading holders/cargo interests arising out of the Charterers' breaches of contract for failing to discharge the cargo and/or failing to pay for the discharge of the cargo. It is clear that the Charterers had been in breach of their charterparty obligations in failing to arrange and pay for the discharge of the cargo. It was not clear whether the Owners actually faced any claims and whether they would all be covered by the indemnity to which they Owners were entitled. Under the circumstances, it was appropriate to reserve our jurisdiction to deal with a claim for an indemnity at a future date should it arise.

37. It is both customary and reasonable to allow a month for the checking and settlement of accounts. We therefore awarded interest from one month after the completion of discharge.

38. Since they had been successful, the Owners were entitled to recover their costs from the Charterers as well as the costs of our award if they should have borne them in the first instance.

**IN THE MATTER OF THE**
**ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN**
**ARBITRATION**


B E T W E E N :-


**ARDEMAR MARINE**
**LIMITED**
**Claimants**
(Owners)

-   and –


**SCOTLINE INC.**

**Respondents**
(Charterers)


**"SHAKHTAR"**

**Charterparty dated 5th**
**December 2005**


**PARTIAL ARBITRATION**
**AWARD**